# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **LARRY D. WILSON** | * | **CIVIL ACTION NO.  10-0464** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and ©.  For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

### Background & Procedural History

Larry Wilson filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on August 22, 2007.  (Tr. 136-145, 148-150).  He alleged disability as of August 10, 2007, because of heat stroke, high blood pressure, diabetes, and high cholesterol.  (Tr. 163, 167).  The claims were denied at the initial stage of the administrative process.  (Tr. 55-61).  Thereafter, Wilson requested and received a December 18, 2008, hearing and a July 2, 2009, supplemental hearing before an Administrative Law Judge ("ALJ").  (Tr. 24-54).  However, in a September 9, 2009, written decision, the ALJ determined that Wilson was not disabled under the Act, finding at Step Five of the sequential evaluation process that he was able to make an adjustment to work that exists in substantial numbers in the

national economy.  (Tr. 9-21).  Wilson appealed the adverse decision to the Appeals Council.  On

March 5, 2010, however, the Appeals Council denied Wilson's request for review;[1] thus the

ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On March 23, 2010, Wilson sought review before this court.  He alleges the following

errors,

(1)     the ALJ committed reversible error by rejecting the opinion of Wilson's treating
        physician;

(2)     the ALJ failed to properly evaluate his subjective complaints and credibility; and

(3)     the Commissioner did not meet his burden at Step Five of the sequential
        evaluation process.

**Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the

ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa

v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is

supported by substantial evidence, the findings therein are conclusive and must be affirmed.

*Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported

by substantial evidence when the decision is reached by applying improper legal standards.

*Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v.

Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a

preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial

evidence is proper when no credible medical findings or evidence support the ALJ's

determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court

---

[1]  The Appeals Council set aside its earlier January 27, 2010, denial.  (Tr. 1, 6-8).

may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)      An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

3

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See, Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

<u>**Analysis**</u>

**I.      <u>Steps One, Two, and Three</u>**

The ALJ determined at Step One of the sequential evaluation process that Wilson had not engaged in substantial gainful activity during the relevant period. (Tr. 14). At Step Two, he found that he suffers severe impairments of diabetes mellitus, hypertension, and status post cerebrovascular accident. *Id*. He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process. (Tr. 14-15).

**II.     Residual Functional Capacity**

The ALJ next determined that Wilson retains the residual functional capacity to perform

light work,[2] reduced by the ability to frequently (as opposed to constantly) handle and finger with his left, non-dominant hand.  (Tr. 15).  In so deciding, the ALJ discounted Wilson's testimony and the opinion of his treating physician, Ernie Rutherford, M.D.  Instead, he effectively credited the initial findings of the consultative physician, David Hebert, M.D., and at least a portion  of the findings of another consultative examiner, Michael O'Neal, M.D.

      a)      <u>Chronology of Relevant Medical Evidence</u>

On, or about August 9, 2007, Larry Wilson suffered a cerebrovascular accident which hospitalized him from August 10-15, 2007.  (Tr. 216-218).  At that time, an MRA of the brain showed occlusion of the right internal carotid artery with evidence of reconstitution.  *Id*.[3]  At discharge, Wilson's left-side weakness had resolved and he was diagnosed with a transient ischemic attack.  *Id*.  The physicians advised him to avoid excess fluid and not to work.  *Id*.  His discharge instructions directed him to avoid excessive work, and advised him not to work.  (Tr.

---

   [2]  Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

   [3]  An August 13, 2007, echocardiogram showed normal left ventricular systolic function (ejection fraction 60%); mild mitral regurgitation; trivial tricuspid regurgitation; no effusions; and an inferior venal cava.  (Tr. 223).  Also on that date, an ultrasound of the bilateral carotid revealed right ICA occluded, mild plaque within the left ICA, but no evidence of hemodynamically significant stenosis.  (Tr. 227).

305).  However, he remained free to perform activities, as tolerated.  *Id.*

Notes from a September 13, 2007, visit to the LSU Medicine Clinic indicate that Wilson
was able to move all of his extremities and handle his own activities of daily living.  (Tr. 280).
He was directed to return in three months.  *Id.*

On October 1, 2007, a non-examining agency physician, Johnny Craig, M.D., remarked
that Wilson suffered a cerebrovascular accident with all neurologically deficits resolved within
five days.  (Tr. 283).   Nonetheless, on November 17, 2007, Michael O'Neal, M.D. examined
Wilson at the request of Disability Determination Services.  (Tr. 284-287).  Wilson told O'Neal
that he had some initial left-sided hand deficits immediately after the stroke that had since **mostly
resolved**.  *Id.*  He reported that he had been told not to lift things "too heavy."  *Id.*  He added that
he could not  walk more than 75-100 yards before he began to experience leg pain.  *Id.*  **He
stated that he had no problem with activities of daily living.**  *Id.*  He denied depression,
nervousness, anxiety, difficulty concentrating, or sleeping at night.  *Id.*

Upon examination, Wilson was positive for low back, hand, knee, and persistent shoulder
pain.  *Id.*  However, he exhibited no muscle asymmetry, atrophy, or involuntary movements.  *Id.*
He had no tenderness of the joints except for pain on range of motion testing of the left shoulder.
*Id.*  He also demonstrated **minimal decreased strength of the left hand**.  *Id.*  He exhibited
normal strength of the lower extremities.  *Id.*  He was able to rise from a sitting position without
assistance.  *Id.*  He could stand on tiptoes, heel and tandem walk, bend and squat without
difficulty.  *Id.*  He had 4/5 grip strength on his left hand and 5/5 on right, with adequate fine
motor movements, dexterity and ability to grasp objects **bilaterally**.  *Id.*  His recent and remote
memory was intact.  *Id*.  He had good insight and cognitive function.  *Id.*  Although his
proprioception in his left foot was different than his right foot, the loss was minimal.  *Id.*

6

O'Neal diagnosed stroke, hypertension, diabetes, and high cholesterol.  *Id.*  He opined that, objectively, Wilson had a full range of motion of all extremities, with minimal decreased strength of the left hand, but with the ability to grasp objects.  *Id.*  He was able to sit, walk, and/or stand for a full workday.  *Id.*  Because of his wide-based gait, he should not lift objects more than 40-50 pounds.  *Id.*  He was able to hold a conversation and carry out and remember instructions.  *Id.*

After O'Neal issued his report, the non-examining agency physician, Dr. Craig, recommended a residual functional capacity for the full range of medium work.  (Tr. 289).  An agency disability examiner dutifully incorporated this assessment onto the proper agency form. (Tr. 290-297).

Clinic notes from September 18, 2008, indicate that Wilson needed a statement for the "Body/Soul" organization to obtain help around the house.  (Tr. 325).

On October 2, 2008, he had 4/5 strength in his left upper extremity and was able to move all extremities.  (Tr. 316).  He was able to handle his own activities of daily living, without assistance.  *Id*.  Nonetheless, Dr. Rutherford wrote a note indicating that Wilson needed much assistance during the day, and was unable to return to work.  (Tr. 303).  On October 6, 2008, Rutherford completed a note stating that Wilson required another person to be in the home full-time because of his disability or illness.  (Tr. 302).  He further indicated that Wilson was unable to engage in any substantial gainful activity because of his diabetes, hypertension, and cerebrovascular accident.  *Id.*

On November 14, 2008, Dr. Rutherford completed a two page form wherein he indicated that Wilson complained of stroke, hypertension, and diabetes mellitus.  (Tr. 299-300).  He noted that Wilson suffered a greater than 50 percent reduction in his capacity to walk, pull, and travel,

7

and a 20-50 percent reduction in his ability to bend, stand, and stoop.  *Id.*  Sitting and speaking were not limited.  *Id.*  His ability to manipulate fine objects was poor, but gross manipulation was okay.  *Id.*  His ability to perform activities of daily living was reduced by 20-50 percent.  *Id.*  He could not lift more than ten pounds during a workday.  *Id.*  Moreover, he could not engage in full or part-time work.  *Id.*  He was restricted from "any moving."  *Id.*  Although Rutherford indicated that Wilson had no mental impairments, he found that these non-disclosed mental impairments mildly affected his activities of daily living and social functioning and moderately impaired his concentration, persistence, and pace.  *Id.*  Rutherford further noted that Wilson had experienced four or more episodes of decompensation during the last 12 months.  *Id.*  Wilson also was incapable of sitting or performing light activities.  *Id.*  Rutherford concluded that Wilson could do almost nothing, and that his condition began at that time, and was expected to last forever.  *Id.*

On December 6, 2008, Dr. Rutherford completed a medical source statement stating that Wilson suffered from left-side weakness.  (Tr. 306).  He indicated that Wilson could stand for 15 minutes at a time and sit for four hours.  *Id.*  Nonetheless, he can work 0 hours per day.  *Id.*  He can occasionally lift 20 pounds on the right side and frequently lift 10 pounds.  *Id.*  He can occasionally bend, but never stoop, balance or raise his left arm over shoulder level.  *Id.*  He can occasionally manipulate his left hand and frequently manipulate his right arm and lift it over shoulder level.  *Id.*  However, he does not suffer from any pain.  *Id.*

On December 11, 2008, Rutherford completed a medical source statement "regarding cerebrovascular accident for Social Security disability claim."  (Tr. 307-308).  He indicated that Wilson suffered memory loss, expressive aphasia, dysarthia, and ineffective speech or communication.  *Id.*  He can stand for 15 minutes at a time and sit for four hours.  *Id.*  He can work for 0 hours per day.  *Id.*  He can occasionally lift ten pounds and frequently lift five pounds.

*Id.* He can frequently manipulate his right hand and occasionally manipulate his left hand. *Id.* He can constantly raise his right arm over shoulder level, but never raise his left arm over shoulder level. *Id.* He exhibits moderate limitations in his ability to understand, remember and carry out detailed instructions and to maintain attention and concentration. *Id.*

Despite these ostensibly debilitating limitations, clinic notes from Wilson's December 11, 2008, visit, indicate that he was able to handle activities of daily living by himself. (Tr. 309). He also could move his extremities in all directions. *Id.*

On January 22, 2009, David Hebert, M.D., examined Wilson at the request of Disability Determination Services. (Tr. 332-335). During the examination, Wilson reported that his left arm remained weak and he could not use it. *Id.* He also reported that his left side was numb, and he had no feeling. *Id.* He stated that he could not stand or walk for more than one hour per day and could not lift anything with his left hand. *Id.* Hebert observed that Wilson had a second finger that was essentially straight, and could not be flexed. *Id.* He further noted that Wilson had no real history of chest pain, swollen ankles, irregular pulse or shortness of breath on exertion, congestive heart failure or myocardial infarction. *Id.*

Upon examination, Wilson exhibited a full range of motion of the lumbar spine; straight leg raising was negative bilaterally; gait and station were normal without assistive devices; however, he declined to walk on his heels and toes because of purported left leg weakness. *Id.* He exhibited no clubbing, edema, or muscle atrophy. *Id.* All joints had normal function. *Id.* His deep tendon reflexes were +2 bilaterally, but there was a lot of malingering. *Id.* Hebert believed that the motor strength on the right upper and lower extremities was 5/5. *Id.* He believed that his motor strength in the left arm was essentially 5/5 in all areas; hand grip was 5/5 bilaterally even with the second finger unable to grip. *Id.* Wilson exhibited no significant

neurological deficits.  *Id.*

Hebert diagnosed history of middle cerebral infarction in the right cerebral hemisphere which was ischemic in nature; Wilson had fully recovered, however, and suffered no significant neurological deficits at that time.  *Id.*  He further diagnosed Dupuytren's contractures of the left second finger which rendered that finger non-functional, but the left hand itself remained quite functional.  *Id*.  Wilson also suffered arterial hypertension, adequately controlled at that time, but with some evidence of end organ damage because of the right middle cerebral ischemic infarction; Type II diabetes mellitus; and history of hyperlipidemia.  *Id*.  Hebert opined that Wilson had completely recovered from the cerebral infarction.  *Id.*  Medically, Hebert saw no reason why Wilson could not do routine walking, sitting, standing, carrying and lifting for an eight hour day.  *Id.*  Mentally, he was alert and quite functional.  *Id.*  He exhibited a normal range of motion in all joints.  *Id.*

A few weeks later, Wilson was hospitalized from February 18-19, 2009, with constipation, abdominal pain, urinary tract infection, and urinary retention.  (Tr. 336-337).  He was discharged with diagnoses of urinary retention and constipation.  *Id.*  Upon physical examination, Wilson's musculoskeletal system was within normal limits and grossly intact.  (Tr. 338-340).

b)    Discussion

Plaintiff takes issue with the ALJ's residual functional capacity assessment.  He argues that the ALJ erred when he declined to adopt the limitations assigned by his treating physician, Dr. Rutherford.  The court recognizes that

> "ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th

10

> Cir.1985). The treating physician's opinions, however, are far from
> conclusive. "[T]he ALJ has the sole responsibility for determining
> the claimant's disability status." *Moore v. Sullivan*, 919 F.2d 901,
> 905 (5th Cir.1990).
>
> Accordingly, when good cause is shown, less weight, little weight,
> or even no weight may be given to the physician's testimony. The
> good cause exceptions we have recognized include disregarding
> statements that are brief and conclusory, not supported by
> medically acceptable clinical laboratory diagnostic techniques, or
> otherwise unsupported by the evidence. *Scott*, 770 F.2d at 485. In
> sum, the ALJ "is entitled to determine the credibility of medical
> experts as well as lay witnesses and weigh their opinions
> accordingly." Id.; see also 20 C.F.R. § 404.1527(c)(2) ("If any of
> the evidence in your case record, including any medical opinion(s),
> is inconsistent with other evidence or is internally inconsistent, we
> will weigh all the other evidence and see whether we can decide
> whether you are disabled based on the evidence we have.").

*Greenspan*, 38 F.3d at 237.

Here, the ALJ acknowledged Dr. Rutherford's treating relationship with plaintiff, but determined

that Dr. Rutherford's various assessments of Wilson's functional limitations were of "little

value" because of their inconsistencies.  (Tr. 17-18).  The ALJ further observed that the actual

physical findings in the medical progress notes revealed minimal difficulty, and sharply differed

from the exaggerated limitations imposed by Rutherford.  *Id*.

As the ALJ recognized, Dr. Rutherford's findings and comments made it abundantly clear

that Rutherford believed that Wilson was disabled and unable to work.  Under the regulations,

however, a physician's statement that a claimant is disabled or unable to work is accorded no

special significance.  20 C.F.R. § 404.1527(e)(1); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir.

2003).  Furthermore, there is substantial evidence to support the ALJ's rationale for assigning

little weight to the specific limitations recognized by Rutherford.  For example, on November 14,

2008, Rutherford initially indicated that Wilson's ability to sit was not limited, but later opined

that he was incapable of sitting and could do almost nothing.  (Tr. 299-300).  Rutherford also

stated that Wilson had no mental impairments, but then proceeded to assign limitations from these non-existent mental impairments. *Id*. However, Wilson previously acknowledged that he had no problems with concentration, memory, or completing tasks. (Tr. 186).[4] Rutherford further indicated that Wilson had suffered four or more episodes of decompensation, even though there is no evidence of any such episodes in the medical record.

The court further observes that in October-November 2008, Rutherford completed forms which recognized a 20-50 percent limitation in Wilson's ability to perform activities of daily living and documented his need to have someone in his home to assist him. Yet, during the same time period, Rutherford, and/or a nurse, noted on Wilson's medical records that he exhibited 4/5 strength in his left upper extremity, was able to move all extremities, and could handle his own activities of daily living, without assistance. *See* Tr. 309, 316.

Two consultative physicians examined Wilson: O'Neal in 2007 and Hebert in 2009. In contrast to Rutherford, both physicians found that Wilson was capable of at least light work. Although O'Neal further found that Wilson exhibited minimal decreased left hand strength, he still retained the ability to grasp objects. In fact, Wilson admitted to O'Neal that his left-hand deficits had mostly resolved, and that he had no problems with activities of daily living.[5]

For his part, Dr. Hebert suspected malingering by Wilson and opined that he retained 5/5 grip strength bilaterally, even with the inability to bend his second finger. At the supplemental hearing in this matter, Dr. Hebert stated that he knew Dr. Rutherford well, knew him to be

---

[4] Wilson also admitted to Dr. O'Neal that he had no difficulty concentrating. (Tr. 284-287).

[5] Interestingly, however, just two months after his examination with O'Neal, and right after his disability applications had been denied by the state agency, Wilson again described his left hand as "useless." (Tr. 196). However, the medical record during this period does not document such a drastic decrease in functioning.

honest, and deferred to his opinion as plaintiff's treating physician.  (Tr. 46-52).  Hebert

maintained, however, that his examination of Wilson did not reveal the debilitating limitations

imposed by Dr. Rutherford.  *Id.*

      The ALJ ultimately did not credit Dr. Hebert's concession to the expertise of the treating

physician.  Indeed, it is the role of the ALJ, not the physicians, to weigh the medical opinions.[6]

Here, it is apparent that as a matter of professional courtesy, Hebert was hesitant to contradict or

second-guess the opinion of a respected colleague with whom he practices in the same medical

community.  While this reluctance to disagree with the treating physician is understandable, if

this were the rule, then consultative examinations would be rendered superfluous whenever a

treating physician has assessed the effects of a claimant's impairments.  Moreover, while plaintiff

clearly contends that a "tie" between a treating physician and a consultative examiner should

always go to the treating physician, neither the regulations, nor the Fifth Circuit accord such

unequivocal primacy to the treating physician's opinion.  *See Greenspan, supra*; 20 C.F.R. §

404.1527(d)(2).[7]

      Plaintiff further argues that the ALJ erred when he failed to analyze Dr. Rutherford's

opinion(s) in light of the relevant factors set forth in 20 C.F.R. § 404.1527.  *See*, *Newton v. Apfel*,

209 F.3d 448 (5th Cir. 2000).  However, an ALJ need not consider each of the § 404.1527(d)

---

[6]   The ALJ "is entitled to determine the credibility of medical experts as well as lay
witnesses and to weigh their opinions and testimony accordingly."  *Moore v. Sullivan*, 919 F.2d
901, 905 (5th Cir. 1990)(citation omitted).

[7]   Citing the Federal Register, plaintiff argues that a treating physician's opinion should
be given preference when the physician has obtained a longitudinal picture of the claimant's
impairments.  56 Fed. Reg. 36,935 (1991).  The Federal Register further explains, however, that
under the regulations, treating source opinions are generally entitled to greater weight than
opinions from non-treating sources *unless there are clear and specific reasons why they are
outweighed*.  56 Fed. Reg. 36,932.  Of course, that is the situation here.

factors when, as here "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *Ward v. Barnhart*, 192 Fed. Appx. 305, 308, 2006 WL 2167675 (5th Cir. 08/02/2006) (unpubl.) (quoting *Walker v. Barnhart*, 158 Fed. Appx. 534 (5th Cir. 12/9/2005); *see also*, *Bullock v. Astrue*, 2007 WL 4180549 (5th Cir. 11/27/2007) (unpubl.).[8]

Plaintiff further contends that the ALJ failed to fully and fairly develop the record by not re-contacting Dr. Rutherford in an effort to resolve his concerns.  The regulations provide that the Commissioner will seek additional evidence or clarification from a treating source when:  1) the report from the source contains a conflict or ambiguity that needs to be resolved; 2) the report does not contain all of the necessary information; or 3) the report does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 404.1512(e). However, the Commissioner is not required to seek additional evidence from a treating source when he knows that the source cannot or will not provide the information.  20 C.F.R. § 404.1512(e)(2).

Here, Rutherford's inconsistent assessments of Wilson's limitations were hopelessly irreconcilable.  In addition, the assessments were not supported by Rutherford's own treatment notes, which found minimal to no impairment.  Under these circumstances, re-contacting Rutherford would have been a futile exercise.  Moreover, even if the ALJ was obliged to re-contact Dr. Rutherford, the court observes that an ALJ's failure to adequately develop the record does not automatically compel reversal.  *Hyde v. Astrue*, Docket No. 07-30748 (5th Cir. May 12, 2008) (unpubl.) (citing *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984)).  To obtain reversal

---

[8]  The ALJ effectively favored the opinions of the consultative examiners over Rutherford's assessments – at least to the extent they found Wilson capable of a limited range of light work.

because of an ALJ's failure to adequately develop the record, the claimant must also demonstrate resulting prejudice. *Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996). "To establish prejudice, a claimant must show that [she] could and would have adduced evidence that might have altered the result." *Id.* (internal quotation marks omitted). Mere speculation that additional evidence might have made a difference does not suffice. *Hyde, supra*. Plaintiff has not made that showing here.

In sum, the court finds that the ALJ's decision to place little weight, or to "effectively [reject]" the limitation(s) recognized by Dr. Rutherford is supported by substantial evidence. *Ward, supra*.; *see also, Nugent v. Astrue*, 2008 WL 2073891 (5th Cir. May 16, 2008) (ALJ entitled to discount treating physician's conclusory statement because it contradicted earlier treatment notes, objective medical findings, and other examining physicians' opinions).

Plaintiff also argues that the ALJ committed reversible error because he failed to sufficiently justify his determination of Wilson's credibility. When assessing credibility, the ALJ is required to consider the objective medical evidence, the claimant's statements, the claimant's daily activities, and other relevant evidence. SSR 96-7p. The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence. 20 C.F.R. § 404.1529(c)(4). Yet, the ALJ need not follow formalistic rules in his credibility assessment. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

In this case, the ALJ credited the statements regarding the limiting effects of Wilson's impairments only to the extent that they were consistent with the medical evidence and his own residual functional capacity assessment. *See* Tr. 15. Because the ALJ relied upon the evaluations and limitations recognized by the medical professionals to ground his residual functional capacity assessment, he implicitly credited them over Wilson's self-professed

15

limitations.[9]  The ALJ's analysis satisfied the requirements of 20 C.F.R. § 404.1529, and his resolution is supported by substantial evidence.  *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (unpubl.) (opinion as a whole gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. Jan. 3, 2008) (unpubl.) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing);  *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion); *see also Berger v. Astrue*, 516 F.3d 539, 545-546 (7th Cir. 2008) (claimant's drug-seeking behavior may justify skeptical view of claimant's testimony).

## III.    <u>Step Five</u>

The ALJ concluded at Step Four of the sequential evaluation process that Wilson was unable to return to his past relevant work.  (Tr.  19).  Accordingly, he proceeded to Step Five.  At this step, the ALJ determined that plaintiff was an individual closely approaching advanced age, with a high school education, and that transferability of skills was immaterial.  (Tr. 19).  The ALJ observed that given Wilson's vocational factors, and if he were capable of the full range of light work, the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. § 404.1569; Rule 202.14, Table 2, Appendix 2, Subpart P, Regulations No. 4.  However, because Wilson was limited to frequent handling and fingering of his non-dominant, left hand, the ALJ consulted a vocational expert ("VE") to determine the extent that this limitation eroded the occupational base for unskilled light work.  In response, the VE identified a category of jobs that

---

[9]  In addition, as discussed previously, Wilson's own self-described limitations have proved less than consistent.

was consistent with the ALJ's residual functional capacity assessment.[10]

Plaintiff contends that the VE's testimony is flawed, because the ALJ's hypothetical failed to include his vocational background. *See* 20 C.F.R. § 404.1560(c) (vocational factors are a relevant consideration at Step Five). Typically, however, the VE receives relevant information concerning the claimant's background prior to the hearing. *See e.g.*, Tr. 88. Moreover, the court emphasizes that ". . . claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000)*, supra*; *see also Barratt v. Astrue*, 2008 WL 2325636 (5th Cir. June 6, 2008) (unpubl.). If plaintiff's counsel harbored any doubts concerning the sufficiency of the hypothetical posed to the VE, he was obliged to explore the alleged omission and to press the issue upon cross-examination. Nonetheless, even in a post-hearing letter that he submitted to the ALJ, in which he cited the VE's testimony, plaintiff's attorney did not raise any deficiency with the hypothetical. (Tr. 200).

Moreover, to the extent that the ALJ erred by failing to include plaintiff's vocational background in his hypothetical, the error was harmless. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (procedural perfection in administrative proceedings is not required). Plaintiff has not argued or demonstrated that his vocational background precludes the jobs identified by the VE. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights). In fact, the Medical-

---

[10] One representative job identified by the VE at the unskilled, light exertional level was cleaner/housekeeper, DOT # 323.687-014. (Tr. 28, 20). There are approximately 3,800 such positions in Louisiana. *Id*. .

17

Vocational Guidelines direct a finding of "not disabled," given plaintiff's vocational background and residual functional capacity (but for his left hand limitation).  (Rule 202.14, Table 2, Appendix 2, Subpart P, Regulations No. 4).

Plaintiff also argues that the ALJ's hypothetical was deficient because it incorporated a "frequent" limitation on the claimant's ability to finger and handle, as opposed to the "occasional" limitation recognized by Dr. Rutherford.[11]  However, the court finds substantial support for the ALJ's assignment of a "frequent" limitation.  Although Wilson is unable to flex the second digit in his hand, he maintains a strong grip strength, bilaterally.  Dr. Hebert also found that plaintiff's hand remained quite functional.  Under these circumstances, a limitation to "frequent" (i.e. from 1/3 to 2/3 of the time) fingering and handling represents a fair quantification of plaintiff's impairment that is substantially supported by the record.

Nonetheless, even if plaintiff's left hand were limited to occasional use, the VE identified other representative jobs that exist in substantial numbers in the national economy – plaintiff's argument to the contrary, notwithstanding.[12]  Thus, any error was harmless.  *See Audler, supra*.

## Conclusion

The ALJ in this case was tasked with determining whether plaintiff was disabled.  In so doing, he considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence was not uniform, by any means, and could have supported a different outcome.

---

[11]  A hypothetical must reasonably incorporate the disabilities and limitations recognized by the ALJ.  *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994).

[12]  The VE identified representative jobs of Counter Clerk – Photo Finisher, DOT # 249.366-010 and Boat Rental Clerk, DOT # 295.467-014.  (Tr. 28-29).  For each category, there are approximately 6,700 such jobs available at the national level, and 100 available in Louisiana. *Id*.  These jobs, in combination, constitute a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

However, the ALJ ultimately grounded his decision upon the opinions of the consultant examiners.  Such conflicts in the evidence are for the Commissioner to resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra*.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that Wilson was not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error.  Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision to deny disability benefits be **AFFIRMED**, and that this civil action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(c) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 3rd day of February 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE